MEMORANDUM OF DECISION
This memorandum of decision addresses a petition brought to terminate the parental rights (TPR) of Cassandra S. and Andre P., the biological parents of Andrea P., born January 17, 1997. The Department of Children and Families (DCF) filed the TPR petition on January 8, 2002. As amended, the TPR petition alleges, as to each respondent, the lack of an ongoing parent-child relationship with Andrea and failure to achieve rehabilitation when parental rights to another child were previously terminated. For the reasons stated below, the court finds that an ongoing parent-child relationship exists as to each respondent, but also finds that both Cassandra S. and Andre P. have failed to achieve rehabilitation.[2] Accordingly, the court grants the termination of parental rights at issue.[3]
Trial of this highly-contested matter took place on September 25, 26 and 27, 2002. On November 6, 2002 the parties filed additional documentary evidence as a stipulated exhibit. The petitioner, the respondent parents and the minor child were vigorously represented throughout the proceedings.[4] The Child Protection Session of the Superior Court, Juvenile Matters, has jurisdiction over the pending case. Notice of this proceeding has been provided in accordance with the applicable provisions of the Practice Book, and no action is pending in any other court affecting custody of Andrea.
 I. FACTUAL FINDINGS
The Court has thoroughly reviewed the verified petitions, the TPR social study[5] and addendum, and the multiple other documents submitted in evidence which included court records including those subject to judicial notice; psychological evaluations; records related to CT Page 3004-b substance abuse testing and treatment; records of the Department of Public Safety; records and correspondence from DCF; police incident reports; child visitation center records; and the GAL's report. The court has utilized the applicable legal standards[6] in considering this evidence and the testimony of trial witnesses who included a police officer, DCF social workers, a substance abuse worker, a dual diagnosis counsel or a supervised visitation case manager, the foster mother, the paternal grandmother, a parenting educator, and the court-appointed psychologist and the child's GAL.[7] Upon deliberation, the court finds that the following facts were proven by clear and convincing evidence at trial.[8]
 I.A. HISTORY OF THE PROCEEDINGS
The respondents have been known to DCF since May of 1997, a few months following Andrea's birth on January 17, 1997. (Exhibits 1, 31.) The family's presenting problems were substance abuse and domestic violence. (Exhibits 1, 31, A.) From April 1997 through October 1999, the respondents voluntarily and informally placed Andrea in the home of a friend, Lillian B. Neither Cassandra S. nor Andre P. provided anything but minimal financial or material assistance for the child's support, and they rarely visited her.[9] (Exhibits 1, D.)
In October 1999, when Andrea was approximately twenty-one months old, Lillian B. advised DCF that the child was still in her care. (Exhibit D; Testimony of Debbie N.) DCF executed a 96-hour hold, and an OTC was entered by the court (Downey, J.) on October 29, 1999. Andrea was placed in foster care, but on June 13, 2000 the court (Gallagher, J.) vacated the OTC and transferred custody of the child to Lillian B. Thereafter, on August 31, 2000, through a second OTC, the court (Conway J.) removed Andrea from the home of Lillian B., and ordered her placed in a DCF foster home. (Exhibit 1.)
On January 11, 2001, after an extended hearing, the court (Conway, J.) issued orders adjudicating Andrea a neglected child and ordering respondents to undergo a psychological evaluation.[10] Andrea was committed to DCF effective January 2, 2001,[11] and she has remained thereafter under the care of that agency pursuant to orders of the court. On March 14, 2001, the court (Conway, J.) ordered both respondents to undergo interactional evaluations with Andrea. On February 28, 2002, the court (Conway, J.) ordered that Dr. Freedman conduct updated individual psychological evaluations of the parents, interactional evaluations with Andrea, and an interview with Andrea's foster mother, Maggie L.[12]
CT Page 3004-c
 I.B. CASSANDRA S., THE MOTHER
Cassandra S. was born on May 17, 1963. A high school graduate, Cassandra S. has completed some college courses. Certified as a CNA, she has regularly worked in this field.[13] (Exhibits 1, 12, A, C, D.) Cassandra S. reported beginning to use marijuana and cocaine in her mid-twenties. (Exhibit 1.)
Cassandra S. has two other daughters in addition to Andrea and Adrienne. While she was married to William S., Cassandra S.'s daughter Angeline S. was born on November 21, 1988, and her daughter Ariel S. was born on October 2, 1989. These children are in the custody of their father, following a 1998 divorce. (Exhibits 1, 12, D; Court Exhibit 2.)
Her ensuing partnership with Andre P. has been marked by domestic violence and substance abuse. As found in Part I.A., Andrea was born to Cassandra S. and Andre P. on January 17, 1997. Their daughter Adrienne was born on May 24, 1998. The respondents' rights to Adrienne were terminated on January 2, 2001.[14] (Exhibits A, C, D.)
On March 9, 1999, the court ordered specific steps for Cassandra S. to follow in addressing her substance abuse issues, predicate to achieving reunification with Adrienne. Those steps included keeping appointments with DCF, visiting Adrienne, attending individual counseling, submitting to drug testing and treatment at APT, maintaining adequate housing and income, avoiding involvement with the criminal justice system, and issuing releases for DCF.[15] (Exhibit 26.) At that time, Andrea was still in the care of Lillian B. However, as found in Part I.A., the child entered DCF's care in October 1999; was returned to Lillian B. for the summer of 2000, and has thereafter been in DCF's care. Appropriately, DCF provided visitation services to Cassandra S. from March through June 2000. Visits commenced again in August 2000 but were suspended by the court in November 2000 (Conway, J.) in anticipation of a report from the court-appointed psychological evaluator.[16]
To address her substance abuse issues, DCF referred Cassandra S. to APT in the spring of 2000. (Testimony of Debbie N.) After missing one admission interview, Cassandra S. began attending APT sessions on July 5, 2000. Within weeks, she had demonstrated a poor attendance record and continued use of drugs. Accordingly, on July 24, 2000, APT recommended that the respondent mother seek a higher level of treatment through a chemical dependency intensive outpatient program sponsored by a major hospital (HSR).[17] (Exhibit 2.) As found in Part I., Andrea entered long-term DCF foster care in August 2000. Thereafter, in November 2000 and January 2001, DCF referred Cassandra S. to the HSR program, but the CT Page 3004-d respondent failed to attend sessions at that facility. (Testimony of Debbie N.)
On January 31, 2001, the court (Conway, J.) ordered specific steps for Cassandra S. to follow in achieving reunification with Andrea. Similar to the steps issued nearly two years earlier with regard to Adrienne, the 2001 steps prescribed keeping appointments with DCF, visiting the child, participation in parenting and individual counseling, submission to substance abuse testing and treatment, cooperation with in-home support services, procurement of adequate housing and legal income, avoiding involvement with the criminal justice system, and abstinence from drug use.[18] (Exhibit 29.)
On March 7, 2001, upon DCF's third referral, Cassandra S. commenced substance abuse treatment at HSR. She tested positive for marijuana on admission, and reported recent use of cocaine. Although she remained involved with the program, Cassandra S. continued to test positive for cocaine and opiates. Due to her noncompliance, the respondent mother was discharged from the HSR program on May 14, 2001. (Exhibit 1.)
On June 29, 2001, in an effort to promote reunification with Andrea, DCF referred Cassandra S. and Andre P. to counseling and parenting education services at FAPES, a local family service center. On September 11, 2001, Cassandra S. began a thirty-hour parent education and support group at FAPES. She continued with this program until December 2001, at which point FAPES advised her that she should get additional counseling to work on her relationship with Andre P.[19] (Exhibit 1; Court Exhibit 2; Testimony of Annette S-A.)
On August 22, 2001, Cassandra S. commenced a substance abuse program at SATU, a local mental health and substance abuse treatment center. Diagnosed with marijuana dependence and cocaine dependence in early full remission, Cassandra S. tested positive for marijuana on that date. Cassandra S. completed only four group sessions at SATU, but failed to follow through with additional scheduled appointments.[20] (Exhibit 1.) In September 2001, DCF referred Cassandra S. for a substance abuse evaluation at APT, but she failed to attend the appointment scheduled for October 4 or October 9, 2001.[21] (Exhibit 1; Testimony of Luz R.)
In early October 2001, however, Cassandra S. referred herself to the substance abuse treatment program at NCOP, a local health services center, where she requested assistance in stopping her daily use of marijuana and cocaine. (Exhibits 12, A; Testimony of Luz R.) Weekly counseling sessions were scheduled to assist Cassandra S. in learning to build up recovery time, avoid relapses, address emotional factors and CT Page 3004-e maintain abstinence. At NCOP, Cassandra S. tested positive for cocaine and marijuana in October, November and December 2001; she continued to test positive for marijuana during January, February, March, April, and May of 2002. Cassandra S. then stopped attending substance abuse counseling sessions at NCOP, and did not subject herself to further drug testing during the summer of 2002. When she returned to NCOP on September 12, 2002 to recommence substance abuse counseling, Cassandra S. again tested positive for marijuana. (Testimony of Patricia A.)
In early December 2001, Cassandra S. and Andre P. had enrolled in couple's counseling at NCOP. (Exhibit 1.) The couple's presenting issues included reports of anger, hostility, jealousy and stress. They attended two sessions together, during which Andre P. angrily blamed Cassandra S. for his problems, demeaned and overtly dominated her. (Exhibit 14; Testimony of David B.) Discharged from NCOP on January 26, 2002,[22]
Cassandra S. was referred to a family clinic affiliated with a local university (SCSU) to further address couples issues. (Exhibit 14.) On February 14, 2002. Cassandra S. and Andre P. commenced therapy at SCSU "with a presenting problem of domestic issues and spouse abuse." (Exhibit 30.) Their inability to communicate persisted, and frequent arguments were apparent during the sessions, which continued through May 30, 2002.[23] Cassandra S. declined the therapist's recommendation to return for additional therapy to implement and support new behaviors. (Exhibit 30.)
During the winter of 2002, arrangements were made for Cassandra S. and Andre P. to commence weekly supervised visitation with Andrea at a local Family Center (RK). Visits commenced in February 2002, supervised by a staff member and including parent counseling and education sessions. Consistent with visits, Cassandra S. has demonstrated a desire to spend time with Andrea, although she persisted in her illegal use of marijuana (Exhibits 12, 13, 18; Testimony of Tracey M., Patricia A.) Initially, little affection was apparent between parents and their child, although Andrea was pleased to receive the numerous gifts that were brought to her. (Exhibit 18.) The RK staff provided instruction regarding reduction of gift giving, increasing in nurturing behaviors, and decreasing parental domination of the visits, in an effort to emphasize the parent-child relationship. (Exhibit 16.) Cassandra S. decreased gift giving, but continued to dominate the visits, and seemed unable to recognize Andrea's strengths. On occasion, Cassandra S. refused to receive parent education and supervision from the RK personnel. (Exhibits 19, 20.) Despite the parent counseling and educational segments, Cassandra S. continued to demonstrate poor judgment in communicating with Andrea, raising issues that were inappropriate for discussion with a child.[24] (Exhibits 23, 24.) As the respondent mother and her daughter CT Page 3004-f continued to visit weekly month after month, the RK visitation staff observed that affection was absent and that the quality of interaction was poor. (Exhibits 18-24).
 I.C. ANDRE P., THE FATHER
Andre P. was born on February 21, 1964. A high school graduate, he has worked in security and construction, but has also had long periods of unemployment. (Exhibits A, C, D.) As noted, his relationship with Cassandra S. has been marked by domestic violence and joint substance abuse. As found in Part I.A., their daughter Andrea was born on January 17, 1997. Their daughter Adrienne was born on May 24, 1998; their parental rights to this child were terminated on January 2, 2001.[25]
(Exhibits A, C, D.)
Andre P. has a long history of narcotic addiction, attempted methadone treatment and abuse of other drugs. To assist Andre P. in dealing with his substance abuse issues, DCF scheduled an appointment for the respondent father to attend a substance abuse evaluation at APT on October 28, 1998. Although a DCF worker accompanied Andre P. to APT as scheduled, the respondent father left the facility before meeting with the substance abuse case workers. Although a subsequent appointment was scheduled to take place at APT on November 10, 1998, Andre P. did not attend that evaluation. On February 25, 1999, Andre P. provided a urine specimen for assessment at the APT facility, but he refused to participate in the scheduled evaluation.[26] (Exhibit 1.)
On March 9, 1999, the court ordered specific steps for Andre P. to follow in achieving reunification with his daughter Adrienne. Those steps included keeping appointments with DCF, visiting the child, abstinence, submitting to substance abuse testing and treatment at APT, procuring adequate housing and legal income, avoiding involvement with the criminal justice system, and the issuing releases to DCF.[27] (Exhibit 27.) As noted, Andrea was still in the care of Lillian B. at that time. However, as found in Part I.A., the child entered DCF's care in October 1999, was returned to Lillian B. for the summer of 2000, and has thereafter been in DCF's care. Appropriately, DCF provided visitation services to Andre P. from March through June 2000. Visits commenced again in August 2000, but were suspended by the court in November 2000 in anticipation of a report from the court-appointed psychological evaluator.[28] DCF scheduled a substance abuse evaluation for Andre P. at APT on May 24, 2000.
Again, the respondent father did not attend, so his compliance with the effective steps could not be measured. CT Page 3004-g
On January 11, 2001, the court (Conway, J.) ordered specific steps for Andre P. to follow in achieving reunification with Andrea. Similar to the steps issued nearly two years earlier with regard to Adrienne, the 2001 steps required him to keep appointments with DCF, visit the child, participate in parenting and individual counseling,[29] submit to substance abuse testing and treatment, cooperate with in-home support services, procure adequate housing and legal income, avoid involvement with the criminal justice system, and execute releases for the use of DCF.[30] These steps also required Andre P. to achieve and maintain abstinence from drug use. In an apparent effort to correct the respondent father's past behaviors, the court also ordered: "No acts of violence. No threatening or assaultive or destructive behavior. No contact w/[Lillian B.]. No threatening behavior in court or on court premises or toward service providers or DCF." (Exhibit 28.)
To further guide Andre P. in his efforts to achieve rehabilitation and reunification with Andrea, DCF scheduled a substance abuse evaluation for Andre P. to take place at APT on April 4, 2001. (Exhibit 6.) Andre P. attended this evaluation, tested positive for methadone, cocaine and morphine, and was diagnosed with Opiate Dependence and Cocaine Abuse. (Exhibit 1.) Although APT recommended that Andre P. participate in more intensive substance abuse treatment, to compliment his current methadone program, the evidence fails to disclose that he followed through with this suggestion.[31] (Testimony of Luz R.)
On April 10, 2001, Andre P. became involved in an argument with Cassandra S. When the local police responded, he did not cooperate with the police, but yelled and screamed at them, and required physical restraint.[32] (Exhibits 5, 7.) On April 13, 2001. Andre P. became combative during an encounter with a police officer.[33] (Exhibits 5, 7, 8; Testimony of Quincy F.)
In May 2001, at Andre P.'s request, DCF referred Andre P. to the Dual Diagnosis Program at a major medical center (DualDx). Andre P. completed the program, which was about six to eight weeks long.[34]
(Testimony of Luz R.)
On June 29, 2001 in an effort to promote reunification with Andrea, DCF referred Andre P. to parenting education services at FAPES, a local family center. See Part I.B. On September 11, 2001, Andre P. and Cassandra S. began FAPES's thirty-hour program. Both respondents actively participated in the group sessions, which continued through December 15, 2001. (Exhibit 1; Court Exhibit 2; Testimony of Annette S-A.) In September 2001, DCF referred Andre P. for a substance abuse evaluation at APT, but he failed to attend this appointment. (Testimony of Luz R.) CT Page 3004-h Notwithstanding the certificate he had received from the DualDx program, Andre P. failed to attend a substance abuse evaluation that was scheduled to take place at the CTU in October 2001. He failed to attend the random drug screen that DCF scheduled to take place at APT on December 10, 2001. (Exhibit 1; Testimony of Luz R.)
Upon FAPES's recommendation for additional counseling to work on his relationship with Cassandra S., Andre P. enrolled in couple's counseling at NCOP in early December 2001 (Court Exhibit 2.) Andre P. presented with issues of anger, hostility, jealousy and stress. Refusing to take responsibility for his own conduct, he angrily blamed Cassandra S. for his problems, and continued to demean and overtly dominate her. (Exhibit 14; Testimony of David B.) The respondents were inconsistent in attending the counseling sessions scheduled for them at NCOP from December 6, 2001 through January 24, 2002. Ultimately, Andre P. was discharged from the program "due to inconsistent attendance and no change."[35] (Exhibit 14.) He was referred to SCSU to continue to address couples issues and, if he was so motivated, to pursue anger management and individual therapy. (Exhibit 14.) On February 14, 2002, Cassandra S. and Andre P. commenced therapy at SCSU "with a presenting problem of domestic issues and spouse abuse." (Exhibit 30.) Their inability to communicate persisted, and frequent arguments were apparent during the sessions, which continued through May 30, 2002.[36] Andre P. declined the therapist's recommendation to return for additional sessions at SCSU. (Exhibit 30.)
During the winter of 2002, arrangements were made for Andre P. and Cassandra S. to commence weekly clinically supervised visitation with Andrea at the RK facility.[37] Visits, including parent counseling and education sessions, commenced on February 20, 2002. The respondents have been very consistent with their visits, clearly demonstrating a desire to spend time with Andrea. Initially, little affection was apparent between parents and their child, although Andrea was always pleased to receive the gifts that were brought to her. (Exhibits 18-24; Testimony of Tracey M.) The RK staff provided instruction regarding reduction of gift giving, increased nurturing behaviors, and decreasing parental domination at the visits, in an effort to emphasize the parent-child relationship. (Exhibits 16, 17.) Gift giving decreased, although Andre P. on occasion rejected services tendered by the RK personnel. (Exhibits 20, 21.) As Andre P. and his daughter continued to visit weekly month after month, the RK staff found that the absence of affection remained obvious, and the quality of interaction remained poor, while Andre P. continued to demonstrate lack of involvement and lethargy during the sessions. (Exhibits 18-24; Testimony of Tracey M.)
On February 14, 2002, Andre P. and Cassandra S. commenced therapy at CT Page 3004-i SCSU "with a presenting problem of domestic issues and spouse abuse." (Exhibit 30.) Their inability to communicate in an effective manner and frequent arguments were apparent during the sessions, which continued through May 30, 2002.[38] Andre P. declined the therapist's recommendation that they return for additional therapy to implement and support new behaviors. (Exhibit 30.)
Andre P. continued to use illegal drugs throughout the spring and summer of 2002 during the weeks before the commencement of the TPR trial, and during the period when he was having regular contact with Andrea at the RK center. His toxicology reports for May 20, June 22, July 9 and August 12, 2002 all showed that he was using cocaine on a regular basis. (Exhibit 25.)
 I.D. CRIMINAL HISTORY FOR ANDRE P., THE FATHER
Andre P.'s history of involvement with the criminal justice system is notable for matters involving drugs, failure to obey orders of the court and law enforcement, and violence against others. In September 1997, he was convicted of possession of narcotics and failure to appear in court, and was sentenced to two years of incarceration, suspended, with two years of probation. In July 1999, he was convicted of Assault in the 3rd degree and Resisting Arrest, offenses that had occurred on in March 1999, when Andrea was two years old; he was sentenced to one year of incarceration, suspended, with two years of probation. In June 2000, he was convicted of Assault in the third degree for an offense that had occurred in October 1999, when Andrea was nearing her third birthday; he was sentenced to one year of incarceration, suspended, with three years of probation.[39] In November 2001 he was convicted of Breach of Peace and Resisting Arrest for the offenses that had occurred on April 10, 2001, when Andrea was four; he was sentenced to six months, suspended, with two years of probation.[40] In May 2002, he was convicted of Resisting Arrest, the offense that occurred on April 13, 2002, and was fined $100. (Exhibits 4, 5.)
 I.E. ANDREA, THE CHILD
Andrea was born on January 17, 1997, and is now six years old. She resided in the care of her biological parents for a few months, and then the respondent parents left her with Lillian B., a family friend. In October 1999, Lillian B. advised DCF that Cassandra S. had not returned to retrieve her child. DCF executed a 96 hour hold, and on October 29, 1999, the court granted an OTC, placing Andrea in foster care. (Exhibits 1, D; Testimony of Debbie N.) CT Page 3004-j
On June 12, 2000, the court granted another OTC and transferred custody of the child to Lillian B. In October 2000, the court granted a third OTC, removed Andrea from Lillian B.'s home, and the child was temporarily placed in a safe home. On October 4, 2000, she was placed with her current DCF foster mother, Maggie L. (Exhibit 1; Testimony of Debbie N.)
Maggie L. works as a dietary aid, and clearly loves the child at issue. Care for Andrea is also provided by Maggie L.'s two grown daughters, who reside with her and who also love the child. (Exhibits B, 30.) Andrea is very bonded to Maggie L. and her family. She refers to her foster mother as "Miss Maggie" and calls one of her foster mother's daughter's "Mommy Pam." (Exhibits 30, A, B.) Maggie L. is interested in adopting the child, although she has willingly "allowed Andrea to slowly improve her relationships with her biological parents, while having the security of her placement in [her foster] home." (Exhibits B, 1; Testimony Maggie L.)
Andrea is a healthy, happy, well-adjusted child whose mental abilities are "at the lowest end of the average range." (Exhibits B, C, D.) Although in the past Andrea has been reluctant to see Cassandra S. and Andre P., and had been acutely distressed by contact with them, Maggie L. graciously reports that the child now looks forward to being with the respondent parents and attends visits willingly. (Testimony of Maggie L.; Debbie N.)
 I.F. PSYCHOLOGICAL EVALUATIONS
Court-ordered psychological evaluations of Cassandra S. and Andre P., with interactional evaluations of Andrea, were performed by Dr. Freedman on January 22 and March 27, 2001, and March 22 and 26, 2002. As the result of Dr. Freedman's March 2002 evaluation, in which he determined that the respondent parents had made measurable progress in their rehabilitation from substance abuse, anger and domestic violence, the psychologist opined that Cassandra S. and Andre P. "were on the right track toward reunification. If they continued their current progress and regular visiting, it would be reasonable to hope that Andrea could be back in their home in time for [the] next [2002-03] school year." (Exhibit A.) He further recommended that if reunification was to be pursued, weekly visitation should continue on an expanded basis. (Exhibit A.) In June 2002, without having received precise information concerning the continuing discord between the respondents and their continuing unlawful drug use, Dr. Freedman "recommended that the visits with the biological parents be increased in length and frequency, and moved to the parents' home as this occurred. This might be stressful at times for the child, and a combination of individual and family counseling for Andrea CT Page 3004-k and her parents could help handle this."[41] (Exhibit B.)
 I.F.1. CASSANDRA S., THE MOTHER
Dr. Freedman's psychological tests consistently indicated that Cassandra S. is of low-average intelligence. The psychologist has tendered widely divergent prognoses for Cassandra's parenting capacity. After his January 2001 evaluation, Dr. Freedman wrote "that making new attempts at reunification [of Cassandra S. and Andrea] would not be warranted." (Exhibit C.) However, in March 2001, after conducting an interactional assessment of mother and child, he recommended that twice monthly supervised visitation should be provided, on the condition that Cassandra S. participate in a substance abuse assessment, random drug testing, and related treatment, as well as random drug testing. He cautioned that Cassandra S. needed individual and couple's counseling before Andrea could be returned to her care. (Exhibits C, D.)
In March 2002, Dr. Freedman repeated his evaluations at the court's order. In reaching his conclusions, Dr. Freedman noted the respondent mother's past history of domestic violence and drug abuse, but misguidedly assumed that Cassandra S. was no longer affected by either of these issues.[42] Thus, in his report dated March 28, 2002, the court-appointed evaluator opined that Cassandra S. then "showed indications of substantially improved attitude and control of her emotions, as compared to the interview a year ago" and that she "showed reasonable qualifications as a potential custodian and primary caregiver for her daughter."[43] (Exhibit A.
 I.F.2. ANDRE P., THE FATHER
Dr. Freedman's psychological testing revealed that Andre P. has "intelligence in the range of mild mental retardation." (Exhibit D.) During his 2001 psychological interview, Andre P. acknowledged that he sometimes lost his temper with Cassandra S. He also admitted a narcotic addition that had developed in his early adult life, but was unwilling to talk about his drug abuse in an open manner.[44] In his January 2001 report, Dr. Freedman admonished "that in making new attempts at reunification [of Andre P. and Andrea] would not be warranted." (Emphasis added.) (Exhibit C.) However, after conducting an interactional assessment of father and child two months later, he changed his opinion and proposed that twice monthly supervised visitation should be provided, so long as Andre P. signed "releases to allow DCF to obtain information from his methadone program and probation officer" to allow verification of his presumed abstinence. Dr. Freedman also indicated that before Andrea could be returned to his care, Andre P. would need CT Page 3004-l individual and couple's counseling. (Exhibits C, D.)
After his March 2002 re-evaluations, Dr. Freedman noted the respondent father's past history of domestic violence and drug abuse, but inaccurately determined that these conditions had been resolved. He found that Andre P. "showed adequate parenting skills" and an effective, if slow-paced, ability to appropriately interact with and supervise Andrea.[45] (Exhibit A.)
 I.F.3. PARENT-CHILD INTERACTIONS
When Andrea P. met with Cassandra S. and Andre P. at Dr. Freedman's office in March 2001, after a long period of separation but nearly a year before the TPR petition was file, the child was clearly unaware of the respondents' identity or relation to her. Andre P. "had some very basic parenting skills, although he seemed inexperienced and awkward overall . . . [H]e did not show warmth or create real comfort for the child." (Exhibit D.) However, "[t]he interaction between child and mother was relaxed and comfortable. Andrea did not regard her mother as a parent or important caretaker, but responded well to her as a visitor." (Exhibit D.) By March 2002, when Dr. Freedman conducted a repeat interactional evaluation with the respondents shortly after the TPR petition was filed, it was clearly evident that Andrea had an established relationship with Cassandra S. and Andre P. As Dr. Freedman wrote, at that time Andrea "responded happily when she saw her parents, and she and her mother greeted each other warmly." (Exhibit A.)
 II. ADJUDICATION
In the adjudicatory phase of this hearing,[46] the court has considered the evidence related to circumstances and events prior to January 8, 2002, the date upon which the TPR petition was filed, insofar as the allegations pertaining to lack of an ongoing parent-child relationship are concerned.[47] With regard to the allegations of failure to achieve rehabilitation, the court has considered the evidence and testimony related to circumstances occurring through the close of trial.[48] Upon review, as discussed below, the court has determined that the petitioner has met her burden of proving a statutory ground for termination exists as to each respondent.[49] Accordingly, the court denies the parties' pending motions for directed verdict, and enters judgment in favor of the petitioner.
 II.A. LOCATION AND REUNIFICATION EFFORTS
As a predicate to granting a petition to terminate parental rights, our CT Page 3004-m statutes require the court to find by clear and convincing evidence that "DCF has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in [the TPR] proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate . . ."[50]
General Statutes § 17a-112(j)(1); see also In re Amneris P., supra,66 Conn.App. 386. Here the court finds that the petitioner has met her burden of proving by clear andconvincing evidence that the reunification efforts made by, DCF were reasonable given the respondent parents' persistent substance abuse, the continued hostility and discord in their relationship, and their failure to satisfactorily utilize the treatment programs offered to them.[51] Furthermore, based on the clear and convincing evidence produced at trial, the court now finds that both parents are unable or unwilling to benefit from the reunification efforts contemplated by § 17a-112(j)(1). In re Ebony H., supra, 68 Conn.App. 348.
 II.A.1. CASSANDRA S.
Under the circumstances of this case, Cassandra S.'s domestic issues and pattern of substance abuse had to be effectively remediated before she could be reunified with her daughter. The comprehensive, clear and convincing evidence presented in this matter establishes that DCF proffered numerous services to Cassandra S. in a reasonable effort to assist her in achieving reunification with Andrea, and that the respondent mother engaged in some services on her own, as fully discussed in Parts I.B. and II.B.1.[52] As a result of DCF's referrals or her own contacts, Cassandra S. had access to substance abuse treatment and drug screens at APT, HSR, SATU and NCOP. Despite the consistent availability of substance abuse treatment. Cassandra S. failed to adequately partake of these services, attending sessions only sporadically and continuing to test positive for cocaine and marijuana through December 2001. Notwithstanding the attentive efforts of her NCOP substance abuse counselor and frequent sessions with that provider commencing in October 2001, Cassandra S. continued to test positive for marijuana up through the time of trial. The respondent's substance abuse habit was so deeply entrenched, and she was so resistant to participation in continuous treatment, that she was effectively unable or unwilling to benefit from the meaningful, reasonable reunification services that were made available.[53]
In addition to drug treatment, DCF proffered services to assist Cassandra S. in addressing her issues of domestic violence and poor parenting judgments. Through referrals for parenting education at FAPES, couple's counseling at NCOP and SCSU, and parenting education and weekly CT Page 3004-n clinically supervised visitation at the RK Center, Cassandra S. was given abundant opportunities to ameliorate her unhealthy relationship with Andre P., to improve her capacity to communicate with him and Andrea in an effective and appropriate manner, and to recognize how her own lifestyle would adversely affect her ability to care for a young, dependent child. Although Cassandra S. failed to adequately cooperate with counseling at NCOP, she attended a majority of her sessions at SCSU. Unfortunately, although unresolved anger and hostility continued to permeate her relationship with Andre P., Cassandra S. failed to follow up on SCSU's referral for additional treatment. Whether it was due to her own ingrained personality style, or to her chronic marijuana use which clouded her capacity to accurately gauge the seriousness of her domestic issues, it is clearly and convincingly apparent that Cassandra S. was unable or unwilling to benefit from the family counseling services that were extended to her.
The clear and convincing evidence, in this case further reveals that DCF provided Cassandra S. with reasonable efforts at reunification through the extension of regular, appropriate opportunities for visitation with Andrea, although the respondent mother was unable or unwilling to fully cooperate with these opportunities. As described in Parts I.B. and II.B., Cassandra S. attended less than half of the fifteen visits that were scheduled with Andrea from May through December 2001.[54] In February 2002, DCF arranged for weekly visits with Andrea in a clinically supervised setting at the RK facility, where parenting education and support would again be provided for the respondent father. However, Cassandra S. did not adequately utilize instruction about acceptable means of demonstrating affection for or communicating with the child, demonstrating that she was unable or unwilling to benefit from reasonable efforts at parenting education. Cassandra S.'s parenting skills, like her substance abuse and relationship issues, remained resistant to the intervention of appropriate service providers. Cassandra S. may have an inherent capacity to serve as a parent for Andrea, as Dr. Freedman has suggested, but she was unable or unwilling to display such skills even in a setting that was specifically designed to improve her parenting abilities.
Cassandra S. protests that DCF did not make reasonable efforts at reunification in this case because the agency declined to implement Dr. Freedman's June 2002 recommendations for enhancing her contact with Andrea.[55] (Exhibit B.) Despite Cassandra S.'s concerns, however, two aspects of the clear and convincing evidence establish that her concerns lack merit. First, as found in Part I.F.1., Dr. Freedman's recommendations for increased visitation were based on the erroneous information and inaccurate data he had been given concerning Cassandra CT Page 3004-o S.'s supposed abstinence from the use of illegal drugs. The psychologist was misinformed, as well, concerning the continued drug use of her partner, Andre P., with whom she maintained a residence, and to whom the child would be exposed if she visited the respondent mother's home.[56]
Second, DCF identified specific, legitimate and reasonable criteria as its reasons for continuing supervised visitation at the RK facility, in lieu of adopting Dr. Freedman's suggestions.[57] The agency objectively considered and relied upon: input of RK staff members who had observed persisting parenting deficits during a number of mother-daughter visits; Cassandra S.'s indifferent record of visitation in the recent past;[58]
and the lack of any reliable indication that her substance abuse was under effective control, or that Andre P.'s drug habit was being adequately managed. (Testimony of Luz R.) Furthermore, there is insufficient evidence from which the court could conclude that she ever raised her concerns through an administrative hearing pursuant to Regs., Conn. State Agencies § 17a-14-1, et seq. and the file reflects no relevant motions from Cassandra S. requesting a court hearing for consideration of the visitation schedules following the issuance of Dr. Freedman's June 2002 report.[59]
Taken as a whole, the clear and convincing evidence reflects that DCF's reunification efforts were thwarted not by the conduct of the department, but by Cassandra S.'s failure to timely and adequately attend to her need for substance abuse treatment, her insufficient participation in visitation from spring 2001 through the end of January 2002, and her failure to resolve her volatile relationship with Andre P. In re AmnerisP., supra, 66 Conn.App. 385 (parent must respond to reunification efforts in a timely way so as to assist the child); see also In re AmeliaW., 62 Conn.App. 500, 506, 772 A.2d 619 (2001); In re Ebony H.,supra, 68 Conn.App. 350. The clear and convincing evidence further establishes that Cassandra S. is unable or unwilling to achieve any substantive, timely benefit from reasonable reunification efforts. See Inre Amneris P., supra, 66 Conn.App. 385; see also In re Amelia W.,supra, 62 Conn.App. 506; In re Ebony H., supra, 68 Conn.App. 350. Accordingly, the court finds that the petitioner has met her burden of proving, by clear and convincing evidence, that reasonable efforts were made to reunify the respondent mother with Andrea as is required by General Statutes § 17a-112(j)(1), and that Cassandra S. is unable or unwilling to benefit from reasonable reunification efforts, as contemplated by § 17a-112(j)(1).
 II.A.2. ANDRE P.
Under the circumstances of this case, Andre P.'s anger, domestic hostility, and substance abuse issues required effective remediation CT Page 3004-p before he could be reunited with Andrea. The extensive, clear and convincing evidence presented in this matter establishes that DCF proffered numerous services to Andre P. in a reasonable effort to assist him in achieving reunification with his daughter, and that the respondent father engaged in some methadone treatment on his own, as fully discussed in Parts I.C. and II.C.2.[60] A chronological summary of the efforts made to engage Andre P. in services indicates DCF's tenacity in making efforts to address the respondent father's underlying substance abuse, domestic violence and relationship issues, despite his lack of cooperation. The respondent father was referred to substance abuse services at APT in May 2000, prior to the court order transferring guardianship of Andrea to Lillian B. in June 2000, he did not comply. After Andrea was adjudicated a neglected child in January 2001, DCF made additional referrals for Andre P. to obtain substance abuse assessments at APT in April, September and December 2001, and at the CTU in October of 2001, but again, he did not comply. To address both his substance abuse and mental health issues, evaluation and treatment at the DualDx program was scheduled for May 2001. To address his anger issues and difficulty in maintaining a peaceful relationship with Cassandra S., couple's counseling was scheduled for NCOP in December 2001, and at SCSU in the winter of 2002; continuation of the SCSU counseling program was also offered in late spring 2002, although Andre P. declined to participate. To address his parenting deficiencies and lack of socialization with Andrea, parenting education and support was scheduled for FAPES in June 2001. Unfortunately, as set forth in Parts I.C. and II.C.1., the clear and convincing evidence further reveals that notwithstanding these efforts, Andre P. failed to adequately participate in the substance abuse screening services proffered at APT or CTU and failed to sufficiently attend his couple's counseling at NCOP and SCSU. While Andre P. completed the DualDx and FAPES programs and attended the initial portion of his counseling at SCSU he was consistently uncooperative with the substance abuse assessments that were proffered. While no drug screens for Andre P. were made available to the court reflecting his status prior to the spring of 2002, from that point forward his tests were positive for cocaine as well as methadone.[61]
(Exhibit 25.)
The clear and convincing evidence in this case further reveals that DCF provided Andre P. with reasonable efforts at reunification through the extension of regular appropriate opportunities for visitation with Andrea, although the respondent father was unable or unwilling to fully cooperate with these opportunities. As described in Parts I.C. and II.C., Andre P. attended less than half of the fifteen visits were scheduled with Andrea from May through December 2001.[62] In February 2002, DCF arranged for weekly visits with Andrea in a clinically CT Page 3004-q supervised setting at the RK facility, where parenting education and support would again be provided for the respondent father. However, Andre P. did not adequately utilize instruction about acceptable means of demonstrating affection for or communicating with the child, demonstrating that he was unable or unwilling to benefit from reasonable efforts at parenting education. Andre P.'s parenting skills, like his substance abuse and relationship issues, remained refractory to the intervention of appropriate service providers. Andre P. may have an inherent capacity to serve as a parent for Andrea, as Dr. Freedman has suggested, but he was unable or unwilling to display such skills even in a setting that was specifically designed to improve his parenting abilities.
Andre P. may argue that DCF failed to meet its obligation to take his mental condition into consideration "when determining what `reasonable efforts' to make at rehabilitation."[63] In re Antony B., supra,54 Conn.App. 479. However, the clear and convincing evidence reflects that DCF adequately attended to this responsibility by referring Andre P. to the DualDx program where he had access to services from May through August 2001. (Exhibit 1.) Andre P. also attended parenting education and support group sessions at FAPES starting in late June 2001 and continuing through the following December.[64] Appropriately, he was referred to counseling programs at NCOP and SCSU to further meet his needs,[65]
although Andre P. failed to take appropriate advantage of these programs or of the extended counseling tendered at SCSU.
Andre P. protests that DCF cannot be found to have extended reasonable efforts at reunification in his case because the agency did not implement Dr. Fredman's June 2002 recommendations for enhancing his contact with Andrea. (Exhibit B.) Two aspects of the clear and convincing evidence establish that his concerns are ill-founded. First, as found in Part I.F.2., Dr. Freedman had relied on erroneous information in making his recommendations for increased visitation, as he had been given inaccurate data concerning Andre P.'s continued use of illegal drugs, and was misinformed as well concerning the continued drug use of his partner, Cassandra S., with whom he continued to reside.[66] Second, DCF identified specific, legitimate and reasonable criteria as its reasons for continuing the regimen of supervised visitation at the RK facility, in lieu of adopting Dr. Freedman's suggestions.[67] The agency objectively considered and appropriately relied upon: detailed input of staff members at the RK visitation facility who recommended only supervised parent-child contact after observing a number of father-daughter visits; Andre P.'s failure to allow screening for substance abuse, inconsistent with Dr. Freedman's recommendations and notwithstanding the court's order requiring him to participate in such CT Page 3004-r testing and to execute releases for the use of DCF;[68] and Andre P.'s lackluster record of visitation in the past. (Testimony of Luz R.) Furthermore, there is insufficient evidence from which the court could conclude that he ever raised any concerns about visitation through an administrative hearing pursuant to Regs., Conn. State Agencies § 17a-14-1 et seq., and the file reflects no relevant motions from Andre P. requesting a court hearing for consideration of the visitation schedules following the issuance of Dr. Freedman's June 2002 report.[69] In addition, as found in Part I.F.2., Dr. Freedman had relied on erroneous information in making his recommendations for enhanced visitation, as he had been given inaccurate data concerning Andre P.'s continued use of illegal drugs, and was misinformed as well concerning the continued drug use of his partner, Cassandra S.[70]
Viewed as a whole, the clear and convincing evidence reflects that DCF's reunification efforts were thwarted not by the conduct of the department, but by Andre P.'s failure to timely and adequately attend to his needs for substance abuse treatment; his persistent use of illegal drugs during methadone treatment and while on probation; his insufficient participation in visitation from spring 2001 through December of that year; and his failure to resolve his issues of anger and inter-personal hostility. In re Amneris P., supra, 66 Conn.App. 385 (parent must respond to reunification efforts in a timely way so as to assist the child); In re Amelia W., supra, 62 Conn.App. 506; In re Ebony H.,supra, 68 Conn.App. 350. The clear and convincing evidence further establishes that Andre P. is unable or unwilling to achieve any substantive, timely benefit from reasonable reunification efforts. See Inre Amneris P., supra, 66 Conn.App. 385; see also In re Amelia W.,supra, 62 Conn.App. 506; In re Ebony H., supra, 68 Conn.App. 350. Accordingly, the court finds that the petitioner has met her burden of proving, by clear and convincing evidence, that reasonable efforts were made to reunify the respondent father with Andrea as is required by General Statutes § 17a-112(j)(1), and that Andre P. is unable or unwilling to benefit from reasonable reunification efforts, as contemplated by § 17-112(j)(1).
 II.B. STATUTORY GROUNDS FOR TERMINATION — CASSANDRA S. II.B.1. CASSANDRA S. — FAILURE TO REHABILITATE WITH PREVIOUS TERMINATION OF PARENTAL RIGHTS — § 17a-112(j)(3)(E)
As to Cassandra S., the petitioner alleges that the statutory grounds for termination established by General Statutes § 17a-112(j)(3)(E) exist in this case, supporting termination of her parental rights to Andrea.[71] Cassandra S. counters that she has attended to the pivotal CT Page 3004-s elements of the specific steps, and has made sufficient progress in rehabilitation to resume a responsible role in Andrea's life. It is uncontroverted that Cassandra S.'s parental rights to her biological daughter Adrienne were terminated by court order on January 2, 2001, pursuant to a petition filed by DCF (Exhibit 31.) It is further uncontroverted that Andrea is under the age of seven years, and that she was adjudicated a neglected child effective January 2, 2001. The remaining issue for this court is whether the respondent mother has achieved rehabilitation in the statutory sense.[72] Applying the requisite legal standards, and construing the statute in accordance with § 17a-112(p).[73] the court finds this issue in favor of the petitioner.
Several aspects of the clear and convincing evidence in this case compel the conclusion that Cassandra S. has yet to achieve a sufficient degree of rehabilitation with regard to her underlying issues of substance abuse, parenting deficits and domestic discord as would encourage the belief that at some reasonable date in the future she could assume a responsible position in Andrea's life. See In re Daniel C.,63 Conn.App. 339, 354, 776 A.2d 487 (2001); In re Ashley S., supra,61 Conn.App. 665; In re Sarah Ann K., supra, 57 Conn.App. 448. First, of great concern is the fact that Cassandra S. has blatantly continued to use illegal drugs despite multiple opportunities for treatment that were tendered during the many years when Andrea was maintained in formal or informal foster care.[74] Although she was prohibited from using drugs by the steps imposed in March 1999 and in January 2001, Cassandra S. continued to use illegal drugs, exhibiting a characteristic that is clearly indicative of her inability to provide a safe, lawful and appropriate home for Andrea. As described in Parts I.B. and II.A.1., tests performed at HSR during the spring of 2001, after Andrea's adjudication as a neglected child, established that the respondent mother was still using marijuana. (Exhibit 11.) In the fall of 2001, substance abuse testing revealed Cassandra S.'s continued marijuana use and use of cocaine as well. (Exhibit 13, Testimony of Patricia A.) Even while she continued her substance abuse counseling at NCOP from January through May 2002, Cassandra S. consistently tested positive for marijuana, and in September 2002, when she returned for NCOP drug treatment, the agency tests again indicated that she had again used marijuana in violation of the law and the specific steps. (Testimony of Patricia A.)
It is elementary that unresolved substance abuse and criminal behavior are inimical to responsible parenting, providing a clear indication of an individual's failure to achieve statutory rehabilitation. Here, there was sufficient evidence presented at trial showing that the respondent mother failed to make adequate progress in her personal rehabilitation CT Page 3004-t concerning drug use; that she was inconsistent and insufficiently cooperative in attending the substance abuse treatment proffered at APT, HSR, SATU and even at NCOP, where she missed counseling sessions throughout the entire summer of 2002. In view of Cassandra S.'s persistent drug use which remained unaffected by the specific steps, by substance abuse treatment, or by the legal prohibition against possession of such drugs, the court cannot reasonably conclude that she has achieved a sufficient degree of rehabilitation to enable her to serve as a responsible parent for her child, or that she will be able to reach this goal within the foreseeable future. In re Michael L., 56 Conn.App. 688,694, 745 A.2d 847 (2000) (respondent's continued drug use demonstrated inadequate parenting capacity). See also In re Daniel C., supra,63 Conn.App. 353; In re Ashley S., supra, 61 Conn.App. 665; In re SaraAnn K., supra, 57 Conn.App. 441.
Second, the psychological evidence in this case clearly and convincingly establishes that Cassandra S. has not achieved §17a-112(j)(3)(E) rehabilitation[75] The cogent testimony of Dr. Freedman provides a firm basis for determining that the respondent mother has not yet gained the ability to care for the particular needs of young daughter, even though she may have improved her ability to manage her own life.[76] In re Sarah Ann K., supra, 57 Conn.App. 448; In re AshleyS., supra, 61 Conn.App. 665; In re Amneris P., 66 Conn.App. 377,384-85, 784 A.2d 457 (2000). Warning of the potentially devastating effect that Cassandra S.'s drug habit could have upon the stability of her personality and relationship with Andrea, Dr. Freedman specified that any reunification schedule should require the respondent mother to have a full year of abstinence before resuming care of her daughter. (Exhibit B; Testimony of Dr. Freedman.) This period of abstinence would reliably establish that Cassandra S. was in a position to appropriately care for her child in a safe, lawful environment.[77]
The clear and convincing evidence in this case establishes that Cassandra S. has never met this test of psychological readiness to serve as the primary caretaker for her child. As found in Part I.B., although Cassandra S. apparently stopped using cocaine in December 2001, she continued to use marijuana from November 2001 throughout the period of her active substance abuse treatment at NCOP, which she voluntarily suspended after May 2002. As Cassandra S. did not attend any treatment sessions during the summer of 2002, no laboratory testing was conducted to clearly demonstrate whether she used drugs during that period. (Testimony of Patricia A.) The clear and convincing evidence establishes that within thirty days prior to September 12, 2002, mere weeks prior to the trial of her TPR case, Cassandra S. was still using marijuana. Therefore, despite her many months of substance treatment at HST, SATU CT Page 3004-u and NCOP, from a psychological standpoint, Cassandra S. has not established her capacity to remain free from drug use, as she has not been abstinent for the one-year period identified by Dr. Freedman as a valid measure of her ability to live a drug-free lifestyle and to provide safe, effective parenting for a young, totally dependent child like Andrea. Even if Cassandra S. could be found to have achieved reasonable progress in eliminating her substance abuse habit, she would still remain unable to care for her child; any degree of sobriety she may have gained "is too fragile and the risk of relapse is too great" to allow her to serve as a reliable parenting resource for her young daughter. In reKasheema L., 56 Conn.App. 484, 489, 744 A.2d 441 (2000).
Third, the empirical evidence indicates that despite a bevy of services, Cassandra S. persists in exercising poor judgments insofar as parenting issues are concerned. For a long period of time, she has remained involved in a relationship with Andre P., who had repeatedly subjected her to domestic violence in the past,[78] and who still displays an unsafe pattern of possessing and using cocaine. Even if Cassandra S. has herself stopped using drugs, a conclusion which is unsupported by the evidence, the fact that she allows and permits Andre P. to share her household in and of itself would have an adverse effect upon Andrea's security and well-being if the child was returned to the respondent mother's care. The evidence does not permit the court to ascertain whether Cassandra S. has been actually unaware of Andre P.'s persistent use of illegal drugs, condoned this habit, or whether her bond to the respondent father has rendered her functionally incapable of recognizing the threat his drug use would present to a child living in their home. Under all the circumstances presented in this case, however, it is clear that Cassandra S.'s choice of partner and lifestyle render her unable to provide Andrea with the safe, dependable, and lawful environment in which this young child is entitled to reside.[79]
Fourth, even though the court has twice assigned specific steps to assist Cassandra S. in achieving rehabilitation, the evidence clearly and convincingly indicates that she has failed to fulfill a number of critical measures that are intrinsically related to her ability to provide a safe, appropriate home for Andrea. The facts set forth in Part I.B. reveal that Cassandra S. did not effectively utilize the substance abuse treatment, family counseling and parenting education that was tendered in an effort to improve her ability to care for her daughter, and enable her to provide a safe, appropriate home for the child. As fully discussed herein and in Parts I.B. and II.A.1., Cassandra S. failed to adequately comply with the program requirements at APT, HSR, and SATU, continuing to use drugs and/or demonstrating a lack of compliance with program protocols. Although she more regularly attended substance CT Page 3004-v abuse treatment at NCOP, Cassandra S. avoided involvement with that program during the entire summer of 2002. Although she participated in a parenting education program at FAPES from September through December 2001, she also tested positive for marijuana, thus indicating her continuing inability or unwillingness to accept the fact that drug use is inconsistent with the provision of appropriate child care.
Other empirical evidence further reflects Cassandra S.'s limited ability or willingness to absorb and retain the information and skills necessary for effectively parenting Andrea and communicating with Andre P. Her couple's counseling at the SCSU during the winter of 2002 revealed her inability to effectively communicate with Andre P. and demonstrated that frequent arguments still marked their relationship. As described in Part I.B., she was offered, but declined, continuation of couple's counseling at SCSU beyond May 2002, thereby losing a meaningful opportunity for assistance in implementing and supporting any skills she had developed with regard to domestic communication and self-control. (Exhibit 30.)
Cassandra S.'s experience with the visitation process also reveals her inability to effectively utilize parenting education services. As found in Part I.B., she missed one half of the visits with Andrea that were made available to her during the second half of 2001. Commencing in the winter of 2002, weekly visitation between Cassandra S. and Andrea was provided at the RK visitation center. Although the respondent mother attended regularly and received instruction and guidance from her RK visitation supervisor, Cassandra S. persisted in dominating the activities at visits with Andrea, sometimes showing anger and failing to allow the child to choose activities that were of interest to her. (Exhibits 17-24; Testimony Tracey A.) The evidence does reflect that Cassandra S. made some progress in her ability to interact with Andrea, as their relationship was far more firmly established at the time of Dr. Freedman's 2002 evaluation than it had been in 2001.[80] (Exhibit A.) Overall, however, Cassandra S. remained unable to effectively consider Andrea's psychological needs, sometimes demonstrating poor judgment in communicating with the child and apparently lacking the ability to understand how confusing it could be to promise the child that she would be returning home, or to describe possessions that would await her there, long in advance of the court's consideration of the underlying TPR issues.[81] (Exhibits 23, 24; Testimony of Tracey M.) Cassandra S.'s poor judgment in these matters clearly establish her inability to effectively implement the parenting instructions she had received during visitation sessions at the RK facility, all to the detriment of her child. CT Page 3004-w
Based on all the facts presented in this case, the court finds that Cassandra S.'s rehabilitation is not foreseeable within a reasonable time. In re Daniel C., supra, 63 Conn.App. 353. In reaching this conclusion, the court has analyzed Cassandra S.'s relative lack of present rehabilitation as it relates to Andrea's particular needs for a responsible parent who can provide this child with emotional stability, security, and consistency. Even if Cassandra S. should now actively engage in rehabilitation, those efforts would be "too little and too late" for Andrea given the time that has passed since her adjudication as a neglected child, and given the fact that she has been out of her mother's care for all but the first four months of her life. In re SheilaJ., 62 Conn.App. 470, 481-82, 771 A.2d 244 (2001).
Thus, in its totality, the clear and convincing evidence compels the conclusion that despite some participation in a rehabilitation regimen, Cassandra S. remains without the qualities necessary to successfully parent Andrea and lacks the ability to assume a responsible position in her child's life within a reasonably foreseeable time in the future. Accordingly, based on the clear and convincing evidence presented in this case, the court finds that the petitioner has proved Cassandra S.'s failure to achieve rehabilitation pursuant to § 17a-112(j)(3)(E) by clear and convincing evidence.
III.B.2. CASSANDRA S. — STATUTORY GROUNDS FOR TERMINATION — LACK OF AN ONGOING PARENT-CHILD RELATIONSHIP — § 17a-112(j)(3)(D)
The petitioner next alleges that there is no ongoing parent-child relationship between Cassandra S. and Andrea, and that the child's best interests will not be served by allowing additional time for such a relationship to be developed, so that the TPR petition should be granted pursuant to General Statutes § 17a-112(j)(3)(D).[82] Cassandra S. counters that she has maintained contact with Andrea, and that they have a valuable bond which has been strengthened through visits, so that an ongoing relationship does, in fact, exist. Applying the requisite legal standards and construing the statute in accordance with § 17a-112(p), the court finds that the petitioner cannot prevail on this ground.[83]
The relevant legal algorithm first requires the court to determine whether a parent-child relationship exists between Cassandra S. and her daughter.[84] In re Jonathon G., supra, 63 Conn.App. 525. Examining the totality of the clear and convincing evidence in this case, it is apparent that Cassandra S. has met some of Andrea's need for emotional and moral support, factors specified in § 17a-112(j)(3)(D), both prior to the filing of the TPR petition on January 8, 2002 and thereafter.[85] As found in Parts I.B. and II.A.1., Cassandra S. visited Andrea on half of CT Page 3004-x the occasions made available to her by DCF following Dr. Freedman's March 2001 interactional evaluation. Although the respondent mother surely should have visited with her child more often, the psychological effect of her continued contact was revealed when Dr. Freedman observed and evaluated the mother-daughter connection in March 2002, mere weeks following the submission of the TPR petition at issue. At that time, based upon his own professional assessment, the court-appointed evaluator found that "Cassandra S. and Andrea showed a close relationship, whichhad strengthened and improved over the past year of visiting . . . Andrea recognized [the respondent] as her mother, although her primary attachment was probably to her foster mother."[86] (Exhibit A.) The court finds that there is adequate basis for inferring that this mother-child relationship was discernable in January 2002 when the TPR petition was filed, and that their bond did not suddenly develop in the period between the adjudicatory date and the performance of Dr. Freedman's second interactional evaluation.[87]
In discerning whether a parent-child relationship exists, the court has also found that Andrea maintains valid, present feelings for Cassandra S. and finds that those feelings are of a positive nature.[88] In reJonathon G., supra, 63 Conn.App. 525. The child was uncomfortable when she met with Cassandra S. at Dr. Freedman's office in 2001. However, Andrea's feelings clearly had changed by the time the TPR petition was filed as two months later, as when he observed the interaction between parent and child, Dr. Freedman concluded that Andrea was responsive to Cassandra S., showed a considerable amount of interest in her, and "seemed very happy for the attention [she received] from her mother."[89]
(Exhibit A.) Three months later, when Dr. Freedman observed the foster mother interacting with Andrea in June 2002, the child reported that she enjoyed visiting with Cassandra S. and Andre P. every week, illustrating the lasting nature of her connection to the respondents. (Exhibit B.)
Moreover, the evidence clearly and convincingly reflects that although Andrea has a close bond with her foster mother, this relationship has not displaced the connection the child has developed with Cassandra S. Compare In re John G., supra, 56 Conn.App. 22. At her foster home, Andrea speaks about her biological parents, talks about their activities together, and sometimes refers to scheduled visits with her mother. (Exhibits 33, A.) Although, from a psychological standpoint, the bond between Maggie L. and Andrea remains strong, it is clear that Andrea knows that Cassandra S. is actually her "mother."[90] (Exhibit B.)
However, in contrast to the evidence of a mother-daughter bond adduced through Dr. Freedman, staff from the RK visitation facility reports that while Andrea is well-behaved when in the presence of her parents, she CT Page 3004-y displays no affection for them and repeatedly resists entering the room where Cassandra S. awaits her. (Exhibits 17-24.) The RK staff reports that Andrea remains more comfortable with the visitation supervisors than with her biological parents, reporting that as Cassandra S. and Andrea continue to visit weekly month after month, the quality of interaction continues to be poor. (Exhibits 21, 22.) Upon consideration of the evidence presented through Dr. Freedman and the RK representative, the court has determined that the psychologist's reports and testimony carry greater weight than those of the visitation supervisor insofar as assessment of the parent-child connection is concerned.[91]
Accordingly, by the clear and convincing evidence, the court determines that a valid parent-child relationship exists between Cassandra S. and Andrea.
The clear and convincing evidence in this case thus establishes that a budding but discernable parent-child relationship between the respondent mother and her daughter was in existence as of January 8, 2002, and that thereafter the relationship has developed to a considerable degree. Therefore, whether the adjudicatory date or the trial date is used to circumscribe the scope of the court's consideration of the evidence relevant to the existence of an ongoing parent-child relationship, the petitioner cannot meet her burden of proof under this allegation, and cannot prevail on the TPR ground alleged pursuant to §17a-112(j)(3)(D).[92] In re Jonathon G., supra, 63 Conn.App. 525;In re John G., supra, 56 Conn.App. 22.
 II.C. STATUTORY GROUNDS FOR TERMINATION — ANDRE P. ANDRE P. — FAILURE TO REHABILITATE WITH PREVIOUS TERMINATION OF PARENTAL RIGHTS — § 17a-112(j)(3)(E)
As to Andre P., the petitioner first alleges that the statutory grounds for termination established by General Statutes § 17a-112(j)(3)(E) exist in this case, supporting termination of his parental rights to Andrea.[93] It is uncontroverted that Andre P.'s parental rights to his biological daughter Adrienne were terminated by court order on January 2, 2001 pursuant to a petition filed by DCF; that Andrea is under the age of seven years; and that she was adjudicated a neglected child effective January 2, 2001. The remaining issue for this court is whether the respondent father has achieved rehabilitation in the statutory sense.[94]
Andre P. counters that he has attended to the pivotal elements of the specific steps, and has made sufficient progress in rehabilitation to resume a responsible role in Andrea's life. Applying the requisite legal standards, and construing the statute in accordance with § 17a112(p),[95]
the court finds this issue in favor of the petitioner. CT Page 3004-z
Several aspects of the clear and convincing evidence in this case compel the conclusion Andre P. has yet to achieve a sufficient degree of rehabilitation with regard to his underlying issues of substance abuse, anger and domestic violence as would encourage the belief that at some reasonable date in the future he could assume a responsible position in Andrea's life. See In re Daniel C., supra, 63 Conn.App. 354; In reAshley S., supra, 61 Conn.App. 665; In re Sarah Ann K., supra,57 Conn.App. 448. First, of great concern is the fact that Andre P. has blatantly continued to use illegal drugs despite multiple opportunities for treatment that were extended during the many years when Andrea was maintained in formal or informal foster care.[96] Although he was prohibited from using drugs by the steps imposed in March 1999 and in January 2001, the uncontroverted evidence reveals that Andre P. continued to use illegal drugs even though he was ostensibly participating in a methadone maintenance program. By this conduct, he violated both the spirit of the steps and the laws of this state, and thus exhibiting characteristics that clearly indicate his inability to provide a safe, lawful and appropriate home for Andrea.[97] When he did participate in substance abuse evaluation at APT in April of 2001, he tested positive for morphine and cocaine, as well as methadone. Even though he ostensibly attended a DualDx program during the summer of 2001, Andre P. still refused to participate in substance abuse evaluations at APT or CTU that were scheduled for him during the summer and fall of 2001. (Exhibit 1; Testimony Luz R.) Moreover, tests performed during the spring and summer of 2002 consistently showed that in addition to using methadone, Andre P. was using cocaine, although the instant TPR case was pending, and although he was attending visitation with Andrea at the RK center on a regular basis.[98] (Exhibit 25.) Andre P.'s persistent use of illegal drugs, in violation of the court's specific steps and the laws of this state, provides clear and convincing evidence that he has failed to achieve statutory rehabilitation with regard to his fundamental, disabling substance abuse issues.
It is elementary that unresolved substance abuse and criminal behavior are inimical to responsible parenting, providing a clear indication of an individual's failure to achieve statutory rehabilitation. Here, there was sufficient evidence presented at trial showing that the respondent father failed to make adequate progress in his personal rehabilitation concerning drug use; that he was inconsistent and insufficiently cooperative in attending the substance abuse assessments or follow-up treatment proffered through APT, and CTU, and that he used illegal drugs along with methadone. The evidence makes it abundantly clear that in this case, as in In re Michael L., 56 Conn.App. 688, 694, 745 A.2d 847
(2000); "the respondent continued to use drugs" and thus demonstrated his CT Page 3004-aa inadequate parenting capacity. Without control over his own serious drug problem, Andre P. will remain without the capacity to parent Andrea who, at her tender age, requires reliable and consistent supervision, nurturing, and care. In re Amneris P., supra, 66 Conn.App. 385. In view of Andre P.'s persistent drug use which remained unaffected by the specific steps, by dual diagnosis and methadone programs, or by the legal prohibition against possession of such drugs, the court cannot reasonably conclude that he has achieved a sufficient degree of rehabilitation to enable him to serve as a responsible parent for his child, or that he will be able to reach this goal within the foreseeable future. In reDaniel C., supra, 63 Conn.App. 353; In re Ashley S., supra,61 Conn App. 665; In re Sarah Ann K., supra, 57 Conn.App. 441.
Second, the psychological evidence in this case clearly and convincingly establishes that Andre P. has not achieved § 17a-112(j)(3)(E) rehabilitation.[99] The cogent testimony of Dr. Freedman provides a firm basis for determining that the respondent father has not yet gained the ability to care for the particular needs of his young daughter, and that he has not significantly improved his ability to manage his own life.[100] In re Sara Ann K., supra, 57 Conn.App. 448; In re AshleyS., supra, 61 Conn.App. 665; In re Amneris P., 66 Conn.App. 377,384-85, 784 A.2d 457 (2000). As reflected in Parts I.C. and I.F.2., despite the DualDx program in which he participated at a major medical center during the summer of 2001, it is apparent that when his heroin addiction is stabilized with methadone or under a self-imposed narcotics regimen, it is difficult for Andre P. to maintain adequate alertness, a condition that is essential to providing effective supervision for an energetic child. (Exhibits C, D.) Warning of the potentially devastating effect that Andre P.'s drug habit and corollary symptoms could have upon his ability to maintain a stable relationship with Andrea, Dr. Freedman specified that any reunification schedule should require the respondent father should have a full year of abstinence before the child could be returned to his care. (Exhibit B; Testimony of Dr. Freedman.) This period of abstinence would reliably establish that Andre P. was in a position to appropriately care for his child in a safe, lawful manner, without taking the undue risk that he would expose her to illegal drugs, or that his own substance abuse would otherwise adversely affect her.[101]
There is absolutely no reliable evidence in this matter from which the court could reasonably find that Andre P. has been abstinent for the one-year period necessary to establish his ability to provide safe, effective parenting for a young, totally dependent child like Andrea. To the contrary, the evidence discussed in Parts I.C., D. and II.A.2. clearly and convincingly establishes that Andre P. has a long-term narcotic addiction, that he has been convicted of felony possession of CT Page 3004-ab narcotics, and that he used cocaine throughout the summer of 2002 and during the months immediately prior to trial notwithstanding any long-term methadone maintenance program in which he may have been involved, despite attendance at the DualDx program, and even though he has been prohibited from using drugs through direct order of the criminal courts. The clear and convincing evidence establishes that Andre P. has failed the one-year abstinence test identified by Dr. Freedman as a valid measure of his ability to live a drug-free lifestyle. Even if Andre P. could be found to have achieved reasonable progress in controlling his substance abuse habit, he would still remain unable to care for his child; given his recent use of cocaine, it is clear that any degree of sobriety he may have gained "is too fragile and the risk of relapse is too great" to allow him to serve as a reliable parenting resource for his young daughter.[102] In re Kasheema L., 56 Conn.App. 484, 489,744 A.2d 441 (2000).
Third, the empirical evidence indicates that despite a bevy of appropriate services, Andre P. is still affected by a notable degree of anger which is exhibited in his relationship with Cassandra S., and which would have a harmful effect upon the emotional health and well-being of a child placed in his care. As found in Parts I.B. and C., Andre P. had repeatedly subjected his partner to domestic violence in the past, reaching such a degree of discord in April of 2001 that he threatened to throw her out of an automobile, and displayed no remorse or understanding of the degree to which his angry behavior would affect his victim. (Exhibits 5, 7.) Andre P.'s anger issues were noted at FAPES and at NCOP, where his hostility toward Cassandra S. and demeaning attitude toward her were the subject of attention by the family counselors. As the result of his persistent anger problems, when Andre P. completed his initial course of couple's counseling at NCOP, that agency referred him to SCSU where he was to receive additional treatment for anger management, as well as individual therapy to address his interpersonal conflicts with Cassandra S. (Exhibit 14.) Although he participated in the SCSU counseling program for several months in early 2002 to work on his "domestic issues and spouse abuse" those sessions were marked by frequent arguments that were of concern to the provider. Appropriately, SCSU recognized that Andre P. required additional follow-up therapy to address his anger issues, and proposed an additional course of treatment at that program. Andre P. did not participate as requested, and thereby lost a meaningful opportunity for the professional assistance in implementing and supporting any anger-management skills he may have developed with prior treatment. Thereby, he also demonstrated his lack of cooperation with the long-term counseling process he clearly required. (Exhibit 30.)
Andre P.'s experience with the visitation process reveals that he has a CT Page 3004-ac limited ability to effectively utilize appropriate parenting education services. At the RK visitation center, where he has participated in supervised visitation sessions with an educational component, Andre P. is often observed to have little interaction with his child. His lethargy and lack of participation in these visits was, on at least one occasion, sufficient to cause Cassandra S. to request that the RK visitation supervisor make an effort to involve him in the sessions. Andre P.'s poor judgment in these matters clearly establishes his inability to effectively implement the parenting instructions delivered to him at the RK visitation sessions, where suitable communication with Andrea has been explained to him and patterned for him, all to the detriment of his child.
Fourth, even though the court has twice assigned specific steps to assist Andre P. in achieving rehabilitation, the evidence clearly and convincingly indicates that he has failed to fulfill a number of critical measures that are intrinsically related to his ability to provide a safe, appropriate home for Andrea. Andre P. has been woefully non-compliant with the steps' requirements that he participate in substance abuse assessments and random drug tests. (Exhibits 27, 28.) Although he did participate in a parenting education program at FAPES from September through December 2001, he also failed to attend a number of substance abuse screens that were scheduled for him at APT and CTU during this period, indicating his fundamental inability to accept the fact that others were concerned about his use of illegal drugs, or to apply the basic notion that his use of drugs was inconsistent with providing safe care for a child. When Andre P. did finally agree to comply with the steps by participating in substance abuse evaluations during the summer of 2002 his use of cocaine in addition to methadone became obvious. Thus, even when he did cooperate with the court-ordered drug testing process, Andre P. was shown to have violated the step by continuing his use of illegal drugs.
Although the steps also required Andre P. to cooperate with service providers, he only sporadically attended couple's counseling sessions scheduled to start at NCOP in December 2001; his sessions were discontinued after January 2002, due to his sporadic attendance. As described above, he further failed to cooperate with a service provider by inappropriately declining to continue couple's counseling at the SCSU beyond May 2002. The steps required him to visit with Andrea as scheduled but, as found in Parts I.C. and II.A.2., he failed to fully comply as he missed one half of the visits that were arranged during the period of May through December 2001. By continuing to engage in criminal activities, Andre P. further failed to comply with the specific steps at issue. The January 2001 steps required Andre P. to avoid further involvement with CT Page 3004-ad the criminal justice system, but he nonetheless acquired two sets of charges in April 2001 as the result of obstreperous or disruptive behavior, as found in Part I.D. The steps also required Andre P. to cooperate with the conditions of the probation to which he was assigned as the result of his conviction for Assault in June 2000; however, the April 2001 arrests, in and of themselves, would be sufficient to support a violation of any effective probation. State v. Breckenridge,66 Conn.App. 490, 496, 784 A.2d 1034 (2001); Payne v. Robinson,10 Conn.App. 395, 523 A 2d 917 (1987), aff'd, 207 Conn. 565, 541 A.2d 504, cert. denied, 488 U.S. 898, 109 S.Ct. 242, 102 L.Ed.2d 230 (1988). Andre P.'s violations of the law through possession of cocaine in April 2001, demonstrated through drug testing, was inconsistent with the conditions of the June 2000 probation which prohibited him from violations of the laws of this state, and his possession of cocaine during the summer of 2002, also revealed through drug testing, was inconsistent with like conditions of the probations to which he was subject as a result of his convictions in November 2001 and May 2002. See Part I.D.
Based on all the facts presented in this case, the court finds that Andre P.'s rehabilitation is not foreseeable within a reasonable time. Inre Daniel C., supra, 63 Conn.App. 353. In reaching this conclusion, the court has analyzed the respondent father's relative lack of present rehabilitation as it relates to Andrea's particular needs for a responsible parent who can provide this child with emotional stability, security, and consistency. Even if Andre P. should now actively engage in rehabilitation, those efforts would be "too little and too late" for Andrea given the time that has passed since her adjudication as a neglected child, and given the fact that she has been out of her father's care for all but the first few months of her life. In re Sheila J.,62 Conn.App. 470, 481-82, 771 A.2d 244 (2001).
Thus, in its totality, the clear and convincing evidence compels the conclusion that despite some participation in a rehabilitation regimen, Andre P. remains without the qualities necessary to successfully parent Andrea and lacks the ability to assume a responsible position in his child's life within a reasonably foreseeable time in the future. Accordingly, based on the clear and convincing evidence presented in this case, the court finds that the petitioner has proved Andre P.'s failure to achieve rehabilitation pursuant to § 17a-112(j)(3)(E) by clear and convincing evidence.
 II.C.2. ANDRE P. — STATUTORY GROUNDS FOR TERMINATION — LACK OF AN ONGOING PARENT-CHILD RELATIONSHIP — § 17a-112(j)(3)(D)
The petitioner next alleges that there is no ongoing parent-child CT Page 3004-ae relationship between Andre P. and Andrea, and that the child's best interests will not be served by allowing additional time for this relationship to be developed, so that the TPR petition should be granted pursuant to General Statutes § 17a-112(j)(3)(D).[103] Andre P. contends that he and his daughter have an established relationship which has improved significantly in recent years. Applying the requisite legal standards, and construing the statute in accordance with § 17a-112(p), the court finds that the petitioner cannot prevail on this ground.[104]
The relevant legal algorithm first requires the court to determine whether a parent-child relationship exists between Andre P. and his daughter.[105] In re Jonathon G., supra, 63 Conn.App. 525. Examining the totality of the clear and convincing evidence in this case, it is apparent that Andre P. has met some of the child's basic needs for emotional and moral support, both prior to the filing of the TPR petition on January 8, 2002 and thereafter.[106] As found in Part I.F.2., the court-appointed psychologist had recommended twice monthly visitation between Andre P. and Andrea during the winter of 2001, in an effort to improve the father-daughter bond. (Exhibits C, D.) As found in Parts I.C. and II.A.2., Andre P. visited Andrea on only half the occasions made available to him during the remainder of 2001 and yet, by the time of Dr. Freedman's interactional evaluation in March 2002, mere weeks after the submission of the TPR petition, Andrea and Andre P. had developed a comfortable relationship, both physically and emotionally. At that time, the psychologist observed that Andre P. demonstrated parenting skills that "would be adequate to allow him to provide for the child's care for substantial periods of time, without supervision. The child would be likely to prefer her mother's company, but she showed basic comfort and some closenesss with her father."[107] (Exhibit A.) Thus, within a short time following the date the TPR petition was filed, although Andrea maintained a primary psychological relationship with her foster mother, she had grown closer to her parents and recognized Andre P. as her father. (Exhibit A.) The court finds that there is adequate basis for inferring that this father-child relationship was discernable in January 2002 when the TPR petition was filed, and that their bond did not suddenly develop in the period between the adjudicatory date and the performance of Dr. Freedman's second interactional evaluation.[108]
In discerning whether a parent-child relationship exists, the court must also determine whether Andrea maintain any present feelings for her father and, if so, whether those feelings are of a positive nature.[109]In re Jonathon G., supra, 63 Conn.App. 525. The evidence does disclose that the child was uncomfortable when meeting with her father at Dr. Freedman's office in March 2001. However, Andrea's feelings had begun to change by the time the TPR petition was filed as by the time of the March CT Page 3004-af 2002 interactional evaluation. Dr. Freedman noted obvious indications of a relationship between the child and her father. Andrea was relatively relaxed and content in his company, and she interacted with Andre P. as they engaged in appropriate father-daughter activities. (Exhibit A.) In June 2002, when Dr. Freedman conducted the interactional evaluation of Andrea and her foster mother, the child reported that she enjoyed visiting with both her parents, illustrating the lasting nature of her connection to Andre P. (Exhibit B.)
Moreover, the evidence clearly and convincingly reflects that although Andrea has a close bond with Maggie L., this relationship has not displaced the connection the child has developed with Andre P. Compare Inre John G., supra, 56 Conn.App. 22. At her foster home, Andrea speaks about her biological parents, talks about their activities together, and sometimes refers to scheduled visits with her father. (Exhibits 33, A.) Although, from a psychological standpoint, the bond between Maggie L. and Andrea remains strong, it is clear that Andrea knows that she has both a mother and a father, and that she deeply desires to be placed with her own biological parents in a family unit, or with another father figure and mother figure who can form a household in which she will reside on a permanent basis. (Exhibit B.)
However, in contrast to the evidence of a nascent father-daughter bond adduced through the court-appointed psychological evaluator, staff from the RK visitation facility reports that while Andrea is well-behaved when in the presence of her parents, she displays no affection for them and repeatedly resists entering the room where Andre P. awaits her. (Exhibits 17-24.) Even while acknowledging that Andre P. has visited with Andrea on a very consistent basis, attending nearly scheduled session since the winter of 2002 and clearly demonstrating a desire to be involved with his child, the RK staff reports that Andrea remains more comfortable with the visitation supervisors than with her biological parents, and that the quality of interaction continues to be poor. (Exhibits 21, 22; Testimony of Tracey M.) Upon consideration of the evidence presented through Dr. Freedman and the RK staff member, the court has determined that the psychologist's reports and testimony carry greater weight insofar as assessment of the parent-child connection is concerned.[110]
Accordingly, by the clear and convincing evidence, the court determines that a valid parent-child relationship exists between Andre P. and Andrea.
The clear and convincing evidence in this case thus establishes that a budding but cognizable parent-child relationship between the respondent father and his daughter was in existence as of January 8, 2002, and that thereafter the relationship has developed to a considerable degree. CT Page 3004-ag Therefore, whether the adjudicatory date or the trial date is used to circumscribe the scope of the court's consideration of the evidence relevant to the existence of an ongoing parent-child relationship, the petitioner cannot meet her burden of proof under this allegation, and cannot prevail on the TPR ground alleged pursuant to §17a-112(j)(3)(D).[111] In re Jonathon G., supra, 63 Conn.App. 525;In re John G., supra. 56 Conn.App. 22.
 III. DISPOSITION
As the court has concluded that the petitioner has met her burden of proving a statutory ground for termination as to each respondent,[112]
it next "must determine whether termination is in the best interests of the child.[113] (Citation and quotation marks omitted.) In re QuanitraM., supra, 60 Conn.App. 103; see also In re Valerie D., 223 Conn. 492, 511
and n15, 613 A.2d 478 (1992). In this dispositional phase the court has considered the evidence and testimony related to circumstances and events through the close of evidence.[114] Practice Book 33-5.
 III.A. SEVEN STATUTORY FINDINGS
The court has made each of the seven written factual findings required by General Statutes § 17a-112(k) based upon the clear and convincing evidence presented at trial, and has considered the evidence relevant to each of these findings in deciding whether to terminate parental rights. See In re Jonathon G., 63 Conn.App. 516.
 III.A.1. TIMELINESS, NATURE AND EXTENT OF SERVICES — § 17a — 112(k)(1)
Multiple timely and appropriate services were offered for Cassandra S. including case management, transportation, supervised visitation, referrals for couple's counseling, referrals for substance abuse treatment and parenting education, as described in Parts I.B., II. and II.B.1. Like services for Andre P. included case management, transportation, supervised visitation, referrals for substance abuse evaluation and treatment, dual diagnosis care and treatment, parenting education, couple's counseling, and anger management, as described in Parts I.C., II. and II.C.1.
 III.A.2. REUNIFICATION EFFORTS PURSUANT TO FEDERAL LAW — § 17a-112(k)(2)
DCF made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended, as CT Page 3004-ah found in Part II.A. In addition, the court has found by clear and convincing evidence that neither Cassandra S. nor Andre P. are able or willing to benefit from reasonable reunification efforts. See Part II.A.
 III.A.3. COMPLIANCE WITH COURT ORDERS — § 17a-112(k)(3)
Specific steps were imposed for each parent in 2001 relative to Andrea. (Exhibits 26, 27, 28, 29.) Both Cassandra S. and Andre P. failed to comply with the steps which prohibited them from using drugs; the uncontroverted evidence reveals that they each continued to possess and use cocaine throughout the time when Andrea was in foster care, as set forth in Parts I. and II., violating the law as well as the specific steps. Andre P. also failed to timely execute releases that would have provided DCF with access to information concerning the progress in his rehabilitation, as required by the specific steps, and as recommended by the court-appointed psychological evaluator. (Exhibits 3, 4, 5, 25, C, D; Testimony of Debbie N., Dr. Freedman.)
 III.A.4. THE CHILD'S FEELINGS AND EMOTIONAL TIES — § 17a-112(k)(4)
Fortunately, Andrea appears to remain able to form attachments, despite the multiple caretakers she experienced during her early years. (Exhibit D.) In the past, Andrea had been strongly attached to Lillian B., whom she called "grandma." She has consistently demonstrated a strong emotional bond to Maggie L., whom she regards as a grandmotherly figure. (Exhibits B, C, D.) The child has also expressed a desire to return to the care of Cassandra S. and Andre P., who have been "slowly strengthening their relationships with Andrea." (Exhibit B.)
 III.A.5. AGE OF THE CHILD — § 17a-112(k)(5)
Andrea P. was born January 17, 1997. She has just turned six years old.
 III.A.6. PARENTS' EFFORTS TO ADJUST THEIR CIRCUMSTANCES — § 17a-112(k)(6)
Neither parent has adequately addressed his or her substance abuse issues. Although Andre P. has not maintained lawful employment, Cassandra S. has reportedly maintained appropriate housing and supported the family through her regular work as a CNA.[115] Giving them additional time could well bring their performance, as parents, within acceptable standards sufficient to make it in the best interests of the children to be reunited. CT Page 3004-ai
 III.A.7. EXTENT TO WHICH PARENTS WERE PREVENTED FROM MAINTAINING RELATIONSHIPS WITH THE CHILD — § 17a-112(k)(7)
No unreasonable conduct by the child protection agency, foster parent or third parties prevented either respondent parent from maintaining a relationship with the child at issue in this case.[116] The respondents may claim in that DCF failed to follow Dr. Freedman's recommendations for enhanced visitation opportunities with Andrea. However, as found in Part II.A., DCF made an objective, reasonable determination that visits should continue at the RK center. Cassandra S. is able to work as a CNA and Andre P. is able to do construction work, so that the economic circumstances of either parent cause prevent such relationships, although the limitations and restrictions inherent in the foster care system were in effect.
 III.B. BEST INTERESTS OF THE CHILD — § 17a-112(j)(2)
The court is next called upon to determine whether it would be in Andrea's best interests to terminate the parental rights of Cassandra S. and Andre P.[117] Applying the appropriate legal standards[118] to the facts which are clearly and convincingly apparent in this case, the court finds this issue in favor of the petitioner.
As found in Parts II.B.2. and C.2., the clear and convincing evidence here establishes that Andrea's best interests cannot be served by maintaining a legal relationship with Cassandra S. or Andre P. In reaching this determination, the court has acknowledged that Andrea now recognizes the respondents as being her biological parents, despite the fact that for so many years she was cared for by Lillian B. or by DCF foster parents. The court has further acknowledged six-year-old Andrea's clear indication that she would like to be a part of a family unit which contains both a mother figure and a father figure, a desire that is most reasonable in a general sense. (Testimony of Corinne M.) Speaking on Andrea's behalf, the child's attorney has eloquently argued that the TPR petition should be dismissed, so that she can be allowed to follow through with her expressed interest in spending time with the respondent parents, and eventually residing in their home.[119]
However sincere young Andrea may be in requesting reunification with the respondent parents, the clear and convincing evidence constrains the court from honoring her desires. Despite their professed love for Andrea and their apparent desire for reunification, as found in Parts II.A.1. and 2., B.1. and C.1., the clear and convincing evidence establishes that Cassandra S. and Andre P. have failed to achieve a degree of CT Page 3004-aj rehabilitation that would permit them to resume their role as responsible parents for Andrea now, or in the reasonably foreseeable future notwithstanding the multiple opportunities provided for satisfactorily managing their substance abuse and relationship issues. Despite the passage of time, and the many years that Andrea has spent being cared for by other persons, the respondents have never allowed their child to be the primary focus of their lives; instead, they have continued to use illegal drugs on a persistent basis. While Andrea has increased her acceptance of the respondents, poignantly waiting for them to be ready to serve as her caretakers, the respondents' parenting skills remain profoundly deficient due to their personal drug use and Cassandra S.'s tolerance of Andre P.'s use of cocaine. The respondent parents' lifestyles and interest in drug use are at odds with their parental responsibility to provide an orderly, predictable and lawful environment for a child in their care. Therefore, Cassandra S. and Andre P. simply cannot be relied upon to provide this child with the safe, lawful home she so dearly deserves.
As further found in Parts II.B.2. and C.2., although the respondents love their daughter, both parties have failed to satisfactorily address their domestic issues, as Andre P.'s arguments with Cassandra S. continue to permeate their relationship, which has been marked by the serious domestic violence in April of 2001. The respondents' domestic issues are not conducive to ensuring the continuing safety and security of a young child, such as Andrea, who will intuitively look to her caregivers as role models for her own behavior. By using illegal drugs herself and maintaining a home in which another drug-using adult is also present as a potential caretaker and likely role model, the respondent mother has independently demonstrated that she simply cannot protect a child, such as Andrea, who may be entrusted to her custody. On balance, even if the respondent parents are found to have improved their parenting skills and their ability to manage their personal lives, the court concludes that any benefit Andrea may receive from continuing her legal connection to Cassandra S. and Andre P. would be far outweighed by the risks to which she would be subject if, when returned to their custody, Cassandra S. and Andre P. continued to use illegal drugs and continued their pattern of domestic discord and disruption. Pamela B. v. Ment, 244 Conn. 296, 314; Inre Michael D., 58 Conn.App. 119, 124-25, 752 A.2d 1135 cert. denied,245 Conn. 911, 759 Conn. 505 (2000) (in child protection matters, it is appropriate for the court to consider the "potential risk of harm and not just actual harm").
In contrast to Andrea's own desires, her GAL has vigorously supported termination of parental rights in this case.[120] Based on the clear and convincing evidence presented at trial, the court concurs with CT Page 3004-ak Andrea's GAL's concerns about the respondents' continued drug use, and the potential that Andrea would be subject to domestic violence inadequate care if she were returned to their custody. (Testimony of Corinne M.) In re Michael D., supra, 58 Conn.App. 124-25. Our courts have recognized that "long-term stability is critical to a child's future health and development." In re Eden F., supra, 250 Conn. 709. Furthermore, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." when resolving issues related to the permanent or temporary care of neglected children. In re Alexander V., 25 Conn.App. 741, 748,596 A.2d 930 (1992); see also In re Juvenile Appeal (84-CD), 189 Conn. 276,292, 455 A.2d 1313 (1983). A permanent home is very important for a child, especially a child such as Andrea who has been in foster care for a long time, whose needs will be best served if she acquires "a permanent home sooner rather than later." (Testimony of Dr. Freedman.) While placed with Maggie L., Andrea has been well-served by her foster mother's good common sense and parenting skills, which had helped create a stable, secure and predictable environment for the child, even enabling a relationship to be established with Cassandra S. and Andre P. (Exhibit B.) As Andrea's biological parents are clearly unable to care for her now, and as they are not likely to acquire the ability to do so within a reasonable period, the court adopts the comments of the child's GAL who observed that: "[t]ermination of parental rights would take the negative inconsistency, the inappropriate volatility, and the emotional tug of war that Andrea is subjected to out of this child's realm before emotional and psychological damage ensues." (Exhibit 30.)
Having balanced Andrea's intrinsic need for stability and permanency against the benefits of maintaining a connection with her biological parents, the clear and convincing evidence in this case established that she is entitled to the benefit of ending, without further delay, the uncertainty of the issues raised through this litigation. Pamela B. v.Ment, supra, 244 Conn. 313-14. An appropriate adoptive home should promptly be identified for the child, so that her needs for nurturance and reliable attention from a permanent caretaker can be met as soon as possible.
Accordingly, with respect to the best interests of the children contemplated by § 17a-112(j)(2), by clear and convincing evidence, and based upon all of the foregoing, including the testimony and evidence presented, the court finds that termination of the parental rights of Cassandra S. and Andre P. is in the best interest of the child Andrea P.
 IV. ORDER OF TERMINATION CT Page 3004-al
WHEREFORE, after due consideration of Andrea P.'s sense of time, her need for a secure and permanent environment, the relationship she has with her foster parent, and the totality of circumstances; and having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist for termination of parental rights; and having concluded that the termination of the parental rights at issue will be in the child's best interests, the court issues the following ORDERS:
That the parental rights of Cassandra S. and Andre P. are hereby terminated as to the child Andrea P.
That the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for Andrea P. for the purpose of securing an adoptive family or other permanent placement for this child.
That a permanency plan shall be submitted within 30 days of this judgment, and that such further reports shall be timely presented to the court, as required by law.
BY THE COURT,
N. Rubinow, J.